ORDERED.

**Dated:  June 10, 2021**

Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
www.flmb.uscourts.gov

In re:

                                     Chapter 11

Richard Archibald McGrath           Case No. 3:20-bk-3689-RCT
and Jane McGrath,

       Debtors.

_____/

## AMENDED[1] FINDINGS OF FACTS AND CONCLUSIONS OF LAW

This case came before the Court for trial on the Motion to Dismiss or Convert Case (Doc. 27) and the Motion for Relief from the Automatic Stay (Doc. 29), both filed by Creditor First National Bank of Pennsylvania (the "Bank").   Prior to trial, the parties filed pretrial briefs (Docs. 120 & 127) as well as a joint stipulation of facts (Doc. 116).   Following trial, each party filed written closing arguments (Docs. 131 & 133).   Based on the argument and evidence presented, the

---

[1] The Order is amended to correct a typographical error on what is now page four.

Court makes the following Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rules 9014(c) and 7052.[2]

### FINDINGS OF FACT

On December 31, 2020, Debtors filed a voluntary petition under Chapter 11 of the Bankruptcy Code.[3]  Debtors elected to proceed under Subchapter V of Chapter 11.[4]  Debtors are individuals.

Debtors' Schedule A/B lists three pieces of real property:  (1) a single-family residence in Florida (the "Florida Residence");  (2) a single-family residence in Pennsylvania (the "Pennsylvania Residence");  and (3) a commercial property located in Pennsylvania owned solely by Mr. McGrath (the "Commercial Property").  Debtors moved to Florida and now reside at the Florida Residence.  The Pennsylvania Residence is Debtors' former home.  It is identified as a rental property, but it is not rented.  The Commercial Property is a warehouse leased to three commercial tenants (on a triple net basis), generating gross revenue of roughly $27,000 per month. Because the leases are triple net, the tenants are obligated to make pro rata payments to the lessor for common area maintenance and real property taxes as per the terms of the respective leases.[5]

The Bank filed three proofs of claim secured by the Commercial Property totaling approximately $3,228,122.[6]  Lancaster County filed a claim secured by the Commercial Property for $156,703 for overdue taxes.[7]

---

[2] Fed. R. Bankr. P. 9014(c) & 7052.
[3] 11 U.S.C. §§ 101–1532 ("Bankruptcy Code").
[4] Doc. 73.
[5] Doc. 128 Ex. 19 at 5, ¶ 7; Doc. 128 Ex. 20 at 5, ¶ 7; Doc. 128 Ex. 21 at 5, ¶ 7.
[6] Claim Nos. 8, 9, and 10.  The Bank purports to amend each of these claims to include additional interest and attorneys' fees, but at the same time the Bank now argues that its loans are underwater. The Bank also filed a claim for approximately $515,573, secured by the Pennsylvania Residence. (Claim No. 11).
[7] Claim No. 6.

The Bank's claims reference three mortgage liens on the Commercial Property, entered in 2011, 2013, and 2014 respectively.[8]  Each of the mortgages contain clauses expressly assigning all present and future "rents" to the Bank and granting the Bank a "Uniform Commercial Code security interest in the Personal Property and Rents," as those terms are defined therein.[9]  The mortgages also state: "This mortgage, including the assignment of rents and the security interest in the Rents and Personal Property, is given to secure (a) payment of the Indebtedness and (b) performance of any and all obligations under the Note in the original principal amount . . ."[10]  In addition,  three separate assignments of rent were signed by Mr. McGrath contemporaneously with each of the three mortgages and respective promissory notes.[11]

The three assignments purport to assign all "rents" from the Commercial Property to the Bank.[12]  The 2011 assignment provides the assignment is "absolute" and "is neither collateral nor for additional security" but may only be exercised in the event of a default under the 2011 note.[13] The 2013 and 2014 assignments provide the assignments "grant[] a continuing security interest in, and conveys to [the Bank] all of Grantor's right, title, and interest in and to the Rents[.]"[14]

In 2015, Debtors defaulted on the loans secured by the Commercial Property and the Bank sued Debtors (and their former company Ultimate Sports Co.) in Pennsylvania.  The litigation proceeded in fits and spurts.  But, significant here, the Bank did not formally exercise its rights

---

[8]  Doc. 128 Ex. 12 (the 2011 Mortgage); Doc. 128 Ex. 13 (the 2014 Mortgage); Doc. 128 Ex. 14 (the 2013 Mortgage).
[9]  *See, e.g.,* Doc. 128 Ex. 14 at 4 ("Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property.  In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents."); *see also* Doc. 128 Ex. 13 at 3; Doc. 128 Ex. 12 at 6, ¶ F.
[10]  Doc. 128 Ex. 13 at 4; Doc. 128 Ex. 14 at 4.
[11]  Doc. 128 Ex. 9 (the 2011 Assignment); Doc. 128 Ex. 10 (the 2014 Assignment); Doc. 128 Ex. 11 (the 2013 Assignment).
[12]  It is not clear under which assignment the Bank exercised its rights.  The parties' argument treats the three assignments as, in essence, uniform instruments.
[13]  Doc. 128 Ex. 9 at 5.
[14]  Doc. 128 Ex. 10 at 2; Doc. 128 Ex. 11 at 2.

under the assignments until March 2020.   In September 2020, the Bank obtained judgments on its claims against Debtors.[15]  The Commercial Property was scheduled for a Sherriff's sale March 31, 2021.

On December 3, 2020, roughly four weeks before Debtors filed their bankruptcy petition, a Pennsylvania state court also entered an order compelling the tenants of the Commercial Property to pay all rents (and expenses) directly to the Bank (the "Enforcement Order").[16]

Notwithstanding the Enforcement Order, Debtors filed for bankruptcy and promptly moved to use the rents from the Commercial Property as cash collateral (the "Cash Collateral Motion").[17]   The Bank responded to the Cash Collateral Motion by arguing that, under Pennsylvania law, the rents were not property of the estate and thus could not be characterized as cash collateral.  But before the Court could rule on this issue, an agreed order was submitted resolving the dispute  (the "Agreed Order").[18]  Debtors and the Bank expressly agreed that the revenue from the Commercial Property is "not property of the Debtors' bankruptcy estate under 11 U.S.C. § 541 as [the Bank] exercised its rights in the rents prepetition pursuant to certain assignment[s] of rent."[19]  That is, "[a]s of March 10, 2020, Debtors do not have the right to the rents, including common area maintenance payments, from the tenants of the [Commercial Property]."[20]   Further, the parties agreed that the Bank "has the exclusive right to the rents beginning March 10, 2020, including common area maintenance payments, from the tenants[.]"[21]

---

[15]  Docs. 128 Exs. 43–45.
[16]  Doc. 128 Ex. 66.
[17]  Doc. 12.
[18]  Doc. 56, entered on February 22, 2021.
[19]  Doc. 56 ¶ 2.
[20]  Doc. 56 ¶ 3.
[21]  Doc. 56 ¶ 4.

Early on, in addition to the motions considered here, the Bank timely objected to Debtors' Subchapter V election.[22]  The Bank argued that  Debtors were not eligible to be a "small business debtor" under Subchapter V because they  operated a single real estate asset, namely the Commercial Property.  The definition of a "small business debtor" specifically excludes debtors whose "primary activity" is the business of owning "single asset real estate."[23]  And, the term "single asset real estate" is defined as a single real estate project "which generates substantially all of the gross income of a debtor."[24]  Citing the Agreed Order, the Court concluded that Debtors did not generate substantially all of their gross income from the Commercial Property because  they were not entitled to (and were not receiving) any of the rents.[25]  Debtors' only income is  $3,590 per month from social security.[26]  Thus, Debtors were not ineligible for Subchapter V for the reasons argued by the Bank.

At trial, each side presented expert evidence as to the value of the Commercial Property. The Bank's expert provided a final "as is" valuation of $2.9 million.[27]  Debtors' expert provided a final "as is" valuation of $3.25 million.[28]  These appraisers discussed three approaches to arrive at a final valuation:  the cost approach, the sales approach, and the income-capitalization approach. Both experts indicated the cost approach was inherently difficult to apply to the Commercial Property due to its age.

The Bank's expert did not use the cost-approach, but instead arrived at his final opinion based on the sales approach and income-capitalization approach.  He valued the Commercial

---

[22]  Doc. 30.
[23]  11 U.S.C. § 101(51D).
[24]  11 U.S.C. § 101(51B).
[25]  Doc. 73, entered March 15, 2021.
[26]  Doc. 1 at 39–40 (Schedule I).  Debtors' social-security monthly income is attributable to Mr. McGrath in amount of $2,575 and to Mrs. McGrath in the amount of $1,015.
[27]  Doc. 128 Ex. 87 at 5.
[28]  Doc. 111 Ex. 1 at 43.

Property at $2.9 million under both the sales approach and the income-capitalization approach.[29] Under the income-capitalization approach, he employed a capitalization rate of 8.25% with a net annual operating income of approximately $292,000 to arrive at an "as stabilized" value near $3.45 million.[30]   However, he deducted expected expenses for lease-up costs, parking lot resurfacing, and roof replacement to arrive at the final "as is" value of $2.9 million under the income-capitalization approach.

Debtors' expert used a weighted average of the three approaches to arrive at her final valuation of $3.25 million, which minimized the impact of her cost approach analysis.  Under the income-capitalization approach, Debtor's expert valued the Commercial Property at approximately $4.0 million with a capitalization rate of 6.00% and net annual operating income of approximately $242,000.[31]  Debtors' argument relies solely on their expert's income-capitalization approach valuation.  Debtors' expert did not expressly deduct for rehabilitation expenses (e.g., new roof or parking lot repair), but employed a weighted average of the three approaches yielding a final "as is" valuation of $3.25 million.

Based on the evidence presented, the Court finds the value of the Commercial Property on the date of the petition was $3.0 million.  First, the Court agrees with both experts that the cost approach is of little weight in view of the age of the Commercial Property.  Second, the sales approach testimony left the Court a little puzzled.  Debtors' expert came in at approximately $2.33 million and she seemed to have a very good grasp on the local market.  On the other hand, the sales approach valuation of the Bank's expert was $2.9 million, which was identical to his income-capitalization approach valuation.  Therefore, the Court uses these numbers as a guidepost for

---

[29]  Doc. 128 Ex.  87 at 74.
[30]  Doc. 128 Ex. 87 at 68.
[31]  Doc. 111 Ex. 1 at 42.

valuation purposes, recognizing that variations may be due to the difficult market conditions on the petition date.

The bottom line is that the Commercial Property is an income producing property and the income-capitalization approach makes the most sense and should be given the most weight. The Court was mostly persuaded by the analysis presented by the Bank's expert and his $2.9 million valuation, but with a slight upward adjustment. His capitalization rate of 8.25% was high in view of the local capitalization rate information provided by Debtors' expert. Further, the rehabilitation costs used by the Bank's expert were slightly overstated based on the testimony and photographs introduced into evidence through the experts' reports.

Finally, in weighing the testimony of the Debtors, the Court finds that by filing this bankruptcy they had no intent to reorganize any asset or debt except the Commercial Property. Any other reasons proffered were not credible.

## CONCLUSIONS OF LAW

**I.        Dismissal or conversion under 11 U.S.C. § 1112(b).**

"The Eleventh Circuit Court of Appeals has long recognized that a debtor's lack of good faith constitutes cause for the dismissal of a case pursuant to § 1112(b)[.]"[32] "A determination of bad faith is a question of fact and must be made on a case-by-case basis."[33] "There is no particular test for determining whether a debtor has filed a petition in good faith, but in finding a lack of good faith courts have emphasized an intent to abuse the judicial process and the purposes of the reorganization process."[34]

---

[32] *In re Double W Enterprises, Inc.,* 240 B.R. 450, 453 (Bankr. M.D. Fla. 1999) (citing *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988)).
[33] *Matter of Asanda Air II LLC*, 600 B.R. 714, 721 (Bankr. N.D. Ga. 2019).
[34] *Double W Enterprises*, 240 B.R. at 453.

The Bank argues that Debtors' petition was not filed in good faith within the parameters established by the Eleventh Circuit in *In re Phoenix Piccadilly.* There, a traditional Chapter 11 case was found to be filed in bad faith under the following circumstances: (i) only one real-property asset, to which the debtor did not hold title; (ii) few unsecured claims relative to secured claims, in terms of total dollar-amount; (iii) few employees; (iv) the property was the subject of a state-court foreclosure action; (v) the debtor's financial problems involved a dispute that could be resolved in state court; and (vi) the timing of the bankruptcy filing evidenced an intent to frustrate efforts of the secured creditors to enforce their rights.[35]

But "the factors set forth in *Phoenix Piccadilly* are non-exhaustive and not to be rigidly applied[.]"[36] Indeed, much of the judicial resistance to "single asset real estate" cases represented in *Phoenix Piccadilly* went by the wayside with the enactment of express provisions in the Bankruptcy Code recognizing "single asset real estate" ("SARE") cases. Today, although *Phoenix Piccadilly* factors (particularly its more egregious ones) remain important,[37] in a traditional Chapter 11 case, reorganization of a "single asset real estate" project is at least possible, so long as the debtor complies with the very strict requirements of the Bankruptcy Code.[38]

The Bank established many of the *Phoenix Piccadilly* factors evidencing bad faith. This is a two-party dispute that has been in litigation in Pennsylvania state court for years. But the more interesting question is why are are discussing *Phoenix Piccadilly* factors in a Subchapter V case. After all, a SARE is not eligible for Subchapter V.

How did we get here? Well, the reason that these Debtors were permitted to stay in Subchapter V is because they did not receive income from the Commercial Property. Thus, they

[35] *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394–95 (11th Cir. 1988).
[36] *In re State St. Houses, Inc.*, 356 F.3d 1345, 1347 (11th Cir. 2004).
[37] *Id.*
[38] *See, e.g.*, 11 U.S.C. § 362(d)(3).

technically escaped designation as a SARE.  Now, they want to spin about and use a Subchapter V plan to grab back the rents and for all intents and purposes reorganize a SARE in Subchapter V. This is a subversion of Congress' express exclusion of SAREs from Subchapter V and is not "good faith."

The plan offered by Debtors to evidence their good faith (the "Amended Plan")[39] does just the opposite.  The Amended Plan does not seek to reorganize the mortgage loan on the Florida Residence.  That debt will be paid per contract.  The Amended Plan does not seek to reorganize the debt on the Pennsylvania Residence or rent it.  Debtors' former residence will simply be sold or surrendered.  The Amended Plan does not seek to reorganize Debtors' vehicle loan.  It too will be sold or surrendered.   And, Debtors already have paid off the IRS' claim.[40]   The only purpose of Debtors' plan is to reorganize debt on the Commercial Property—the Bank's claim and the unpaid real estate taxes.  This not only flies in the face of Subchapter V's express exclusion of SAREs, but it also serves no acceptable economic purpose.  Because the Bank's claims exceed the value of the Commercial Property (not to mention the unpaid real estate taxes), there is no remaining value for other creditors or Debtors.  Debtors simply wish to hold the Bank at bay, spend the rents now owned by the Bank, and speculate (without any cost to them) that the Commercial Property may someday increase in value.

Debtors have no present right to any income from the Commercial Property.[41]  This issue was fully litigated in Pennsylvania state court and further documented by the agreement of the

---

[39] Doc. 110.

[40] The IRS has filed an amended claim stating that no further amounts are due.  (Claim No. 12-2).

[41] *Commerce Bank v. Mountain View Vill., Inc.*, 5 F.3d 34, 38 (3d Cir. 1993) ("Under Pennsylvania law, it is clear that the banks were legally entitled to take the steps they did when the debtor was unable to cure the default.  Therefore, the rents are not property of the debtor's estate and are not available for use in a plan of reorganization."). At best, Debtors' may have a residual interest in the rents once the obligations to the Bank are fully paid.  See *In re Loco Realty Corp.*, 2009 WL 2883050, at *7 (Bankr. S.D.N.Y. June 25, 2009) (applying New York law).

parties.    As a result, the Court finds that Debtors' purpose in filing this bankruptcy was to undo the Enforcement Order (and now also the Agreed Order) and to attempt to reorganize a SARE (with no equity) in Subchapter V.    This is an improper use of bankruptcy jurisdiction.    Moreover, Debtors' proposed Amended Plan is unrealistic and there no reasonable likelihood that it will be confirmed.[42]    The Court will therefore dismiss this case for cause under § 1112, with leave to convert to a Chapter 7 case.

## II.        Relief from the automatic stay under 11 U.S.C. §§ 362(d)(1) & (d)(2).

If Debtors elect to convert their case to a Chapter 7 case, the Bank will be entitled to an *in rem* post-conversion stay-relief order to continue with its foreclosure of the Commercial Property in accordance with the findings and conclusions made herein.

Pursuant to § 362(d)(1), the Court may grant relief from the automatic stay, "for cause, including the lack of adequate protection of an interest in property of such party in interest."[43] Adequate protection may be provided by a creditor's equity cushion or by periodic payments sufficient to compensate creditor for diminution in value of creditor's collateral.[44]    The determination of whether an equity cushion exists, for purposes of § 362(d)(1), does not take into account junior liens.    "Junior liens are disregarded for 'equity cushion' analysis because the secured creditor is entitled to adequate protection only as to its claim; it may not claim protection

---

[42]    Debtors argue that their proposed Subchapter V plan may modify the assignments of rent, pursuant to § 1123(a)(5)(F), and that they will be able to capture post-confirmation rents to fund the plan.    This proposition is without precedent but seems especially unlikely here in view of (i) the Enforcement Order; (ii) the Agreed Order; and (iii) Subchapter V's exclusion of SAREs.    Cram down with the facts of this case is also unrealistic.    *See Jason Realty, L.P.*, 59 F.3d 423, 430 (3d Cir. 1995) ("We previously have held that when rents are not property of the debtor's estate, they may not be used to fund a plan of reorganization.") (applying New York law); *In re Superior Siding & Window, Inc.,* 14 F.3d 240, 242 (4th Cir. 1994) ("The 'cause' requirement of § 1112(b) may be satisfied by showing a subjective bad faith on the part of the debtor, in that the motive for filing the Chapter 11 petition was to abuse the reorganization process, coupled with an objective element that reorganization is in fact unrealistic.");  *In re Loco Realty Corp*., 2009 WL 2883050, at *7 (Bankr. S.D.N.Y. June 25, 2009) ("A debtor who has no realistic chance of successfully emerging from bankruptcy should no longer be in chapter 11.").
[43]    11 U.S.C. § 362(d)(1); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 365 (1988).
[44]    11 U.S.C. § 361; *In re Henderson*, 395 B.R. 893, 899 (Bankr. D.S.C. 2008).

for others."[45]  Additionally, pursuant to § 362(d)(2), the Court must "lift a stay affecting a debtor's property if 'the debtor does not have an equity' in the property and the property 'is not necessary to an effective reorganization.'"[46]  The party seeking relief under § 362(d)(2) must show the debtor has no equity in the property (taking into account all claims against the property), after which the burden shifts to the debtor to show that the property is necessary to an effective reorganization.[47]

Here, the Bank's claims standing alone exceed the value of the Commercial Property. Further, given that Debtors have no rights in the revenue generated by the Commercial Property, they have failed to show that they can provide adequate protection in the absence of an equity cushion and that the Commercial Property is necessary to an effective reorganization.  As a result, relief from the automatic stay is warranted under § 362(d)(1) and § 362(d)(2).

The Court will enter a separate final judgment consistent with these Findings of Fact and Conclusions of Law.

Service of the Order other than by CM/ECF is not required. Local Rule 9013-3(b).

---

[45] *In re Indian Palms Associates, Ltd.,* 61 F.3d 197, 207 (3d Cir. 1995); *see also In re HRN Group, LLC*, 2020 WL 6712238, at *6 (N.D. Ga. Nov. 13, 2020) ("Further, because the value of the Property was less than the total amount of Wilmington's claim, Wilmington was entitled to relief from the stay 'for cause' under 11 U.S.C. § 362(d)(1).").
[46] *In re Bagwell*, 741 Fed. App'x 755, 759 (11th Cir. 2018).
[47] 11 U.S.C. § 362(g).